Good morning, Your Honors. If it may please the Court, my name is Andrea Miller. I represent the appellants here, the BBs. The BBs, as you know, and I can tell you, you're really prepared today, you've read everything, are the owners of Bayou Seafood. Bayou Seafood was subjected to a search warrant some 14 years ago that we contend was improper in that the information in it was clearly false and or misleading. The effects, which I think are always important in any case Now, let me understand your lexicon, Ms. Kelson. Yes, sir. There's a difference between incorrect, wrong, false, and misleading. In that fan of adjectives which I just used, misleading to me means that the person who made the statement knew that the statement was false and made the statement nonetheless. Is that how you mean it? Are you saying that Kelson here knew that Moore had said one thing in his report, and he, in his affidavit to the magistrate, said another? Yes. What did Moore say, and what did Kelson say he said? Moore, the documents examiner, said that there were common copier marks on the documents and that would show that they had originated, many of them had originated from Valley Foods, the large business involved. He also said that there were obliterations. He did not say that there was evidence of pricing being communicated through the documents that he examined. He did not say that in his report. Well, he didn't say that the marks had been put on at the same time by the same persons. No. But he compared the fax numbers that the bids had, and the bid of Bayou had a fax number from Valley Foods, and Bayou had a fax number from Valley Foods, and Bayou had a fax number from Valley Foods. And they were all the same type of form. And there were blankouts, and there were numbers on Bayou's bids which had been blanked out. And yes. That he never identified, and that was one of the problems. In his deposition, Mr. Kelson admitted that he had seen no evidence with regard to Bayou. He may have seen it with regard to others, and that's been the problem. Even as far as blankouts. Pricing, exactly. There's no question that under the Small Business Administration preference situation, they advised new bidders, which Mr. Beebe was, that they will not give him bid documents until he is qualified as a preferred small business. So he said, well, you know, how do I get qualified? Well, it could take a year. We have a backup. But they advised everybody, and Mr. Kelson explicitly testified that he knew this at the time he wrote the affidavit. They say, you can go to someone who gets bids from, you know, gets them directly from us, RFPs directly from us, and you can ask them for a copy, and then if you turn out to be low bidder, it will speed up your qualification. So let's get back to what I was asking you. Yes. Moore did state in his report that the marks on Bayou's forms conformed to the marks on Valley's forms, which allows the deduction that Bayou got its forms from Valley. Right. Exactly. Right. And as I just said, yes. The Valley forms had prices, and the Bayou forms had prices. He also testified that as to the Bayou forms, there were some forms that had prices whited out and numbers written over them. Correct? I do not believe he said that. All right. So you say he did not say. In his report, all he really identified were, in general, obliterations. And, for instance, you know, you have a form, and it has the state provides it, and it puts the information on who's getting it. So it's got the name, address, and so on of Valley already on it when Valley receives it. The other thing is that friend Kelson, pardon me, appellant Kelson, in representing that Moore stated that Bayou's and Valley's forms came from a, quote, common source. Right. Knew that they hadn't come from a common source. They did come from a common source. The form itself came from a common source. Well, the form was the states. Yes. And then you could see. You're saying Bayou's prices came from a common source to wit Valley Foods. Well, the way it worked was Valley Foods, and there are documents that show this, would provide It was a supplier to others, and it sold its product, not just to the state. Supplied all over the state to various and sundry institutions and buyers. When Bayou wanted to bid on something, it would ask Valley to price a product. Valley would send it a separate pricing. I will sell this to you for this. Okay. So long as Valley sent a separate pricing, I will sell it to you, Bayou, separate from what Valley was bidding the state, then that's okay. But if Valley was sending its pricing, its bid form to the state to Bayou, then that's not okay. I understand that. And, you know, over and over in his deposition, Mr. Kelson admitted he saw no evidence that Bayou got pricing, documents with pricing on them from Valley. He may have seen it as to other defendants. And this has been the problem with this case from the beginning. Ninety percent of everything in that affidavit is about the other defendants, but he allows it, he kind of smears it out so that it looks as if it applies to Bayou. And can I give you a couple of other examples? Let me go to this immediately. I was going to wait a while, but. What's the most grievous falsity that was made here that you can point to as strongly part of this? Well, I think there are three that are what probably impressed the magistrate judge and made his decision for him. We just talked about one. And as you know, later on, the State did stipulate that no documents examiner would testify that pricing information was found to have been transmitted from Valley to Bayou, and that Mr. Kelson had misrepresented that in the affidavit. They had no determination as to whether that was negligent or intentional. That was a stipulation the State entered in the course of the criminal trial below that incidentally went on for four or five years because of these kinds of things. The problem here was he makes these representations that, number one, these are throughout, he calls them, so-called businesses. In his reports, he refers to them as puppet businesses. That may have been true of the others. They may have been formed specifically to do this business. He knew, and he admitted in his deposition he knew, that Bayou had been in business for years providing food to others. Bayou provided fresh seafood to restaurants and grocery stores and purchasers in the Santa Barbara area. That's what Bayou did and had done for a long time. It was an up-and-running business. When he refers to all of them as the so-called businesses and says they were all basically generated just to, you know, be puppets for Valley, that does not apply to Bayou, and he admits that in his declaration. That's one. Number two is he says all of them have no other business essentially. They do virtually 100 percent of their business, and then he says, but certainly over 70 percent of their income comes from Valley, again asserting they're constructed just to do this scheme that he believes he sees. That was not true with Bayou. In his deposition, and I've cited you to the pages, you know, I asked him, I said, what? I mean, you knew. Didn't you know this? Why did you say this? He said, well, I just assumed. I just assumed. Now, the cases say you don't do that when you're going to turn someone's life upside down. You do not look at the behavior of Party A and say, well, Party B knows them, you know, and he did it. He probably did it too, so I'll just say it. So all these things were carefully put in there to create this impression, and it wasn't true as to Bayou, and he knew it wasn't true as to Bayou. I brought you, if you want them, you may be so familiar with them you don't need them. It's not a matter that he knew that Bayou didn't have other business. According to you, he just assumed they didn't have other business. That was an assumption. Now, that's an incredibly important allegation in his affidavit, and there are Ninth Circuit cases and all other cases that say you don't assume when that's you need that for probable cause. You need to know. That was not hard for him to find out. He, I believe he knew it, actually, because. But the standard is which? Does the standard have to be that Kelson was negligent in making out his affidavit? No. Does, it has to be something, there has to be a mens rea element higher than that. Absolutely. It has to be. Reckless disregard. Reckless disregard, right. Malice. Disregard of the truth. Right. And I contend. When an investigating agent makes a statement, there is no other business like this, and he hasn't. Bayou has no other business, and he hasn't investigated that. That is an indication of the conscious creation of a risk which is similar to malice. Absolutely. I think that's absolutely reckless, especially in an area like this. You know, Mr. Kelson, do you want these? I brought just his affidavit so that we can refer to specific parts of it. If you'd like copies, I'll give it to you. They're all in the excerpt. It's nothing new. If it's in the record, fine. If it's not in the record, we won't read it. No, it is in the record. They're all marked with the excerpt numbers. It was just so we could both refer to the same things if we wanted to. The interesting thing is, and this is sort of what at least the magistrate judge managed to do. I can't tell whether Judge Levy did it. If you look at this affidavit as a whole, you see that the entire first page, ER-202, and down to line 20 on the second page of this five-page document is all about Kelson's knowledge. Okay? Kelson's training. His training. Anybody who's been a Supreme Court judge in California has seen dozens of these. I understand that. But we're in the antitrust field. Now, Federal judges see antitrust all the time. This was a new thing. They went out, the AG went out, and they got Kelson to set this up for them. To do antitrust for them because they perceived him to be an expert based on his experience in Los Angeles. He walked in to talk to the judge who issued this affidavit, and we have testimony that that judge said, as I have no doubt Mr. Kelson anticipated, and we did talk about it in his deposition, he said, I don't know anything about antitrust. I've never seen an antitrust case. Educate me. I see you're an expert. And that's what he did. He educated him. Educated him through the affidavit or through just talk? According to the agent who went with him, because Mr. Kelson, you know, normally Mr. Kelson wouldn't have been there. The agent would have gone with an affidavit from Mr. Kelson, and the agent would have made the pitch to the judge. In this case, Mr. Kelson went with the agent because Mr. Kelson was there to sell his affidavit, quite frankly. Do we go off what was on the affidavit or what he said to the judge? Well, we don't know what he said to the judge. We just know that from Agent Rodriguez, who was there, the judge said, I don't know anything about this. I've never seen anything like this before. Educate me what we're talking about here. Educate me about what I need to find in order to issue a search warrant. And she said Mr. Kelson did just that. They went through it. They talked about it. He told them about his experience. He made analogies, blah, blah, blah. The problem is the stuff that's in here just didn't have anything to do with anything. Was your cause of action based on the affidavit or what was said on the side? I only talk to you about what was said on the side because I believe it demonstrates additionally the intent of this man. You have to base it on the affidavit and what's true or false in the affidavit. We don't have a transcript of what he said to the judge. We talked to him about it, you know, but we don't have that. So it's there to kind of say to you you have to look at this kind of behavior that he went with the agent, that he made himself available, that he engaged in conversation, that he knew likely that was going to happen as sort of demonstrating his intent. He had to sell this thing. Now, if we go through this. Did we know that a warrant was issued immediately or how long from the time they presented the affidavit until the judge issued a warrant? You know, I think he did it right away. I think they brought the warrant with him and he issued it. The judge issued the warrant that day. They brought the warrant with him. They drafted the warrant, and he signed it that day. Yeah, that's what happened. If you took all this stuff out that you're challenging, would there be probable cause here for issuing a search warrant or arrest warrant? If you take out everything that I challenged, what you have is BioSeafood bid to the government. They often bid within 5 percent of Valley Foods, as did, if you look at the charts, most other small businesses. That's their business to bid within 5 percent of major providers. You would know that. And they purchased their products from Valley. How would they know what the bid is? So they come within that 5 percent rule. It's sort of like, and if you look at their charts that they have, and I can give you the site to the page in the appellate's brief, appellee's brief, if you look at the charts they had, for instance, you will see examples of Kellogg bidding when it issues cornflakes. Same thing happens there. The small business calls Kellogg and says, how much will you charge me for 7,000 pounds of cornflakes? And Kellogg gives them a price. That price is typically the same thing they're going to bid to the government. You know, there may be some deviation in terms of delivery and that sort of thing, but it's the same price. So when they get that price from Kellogg, the small business knows full well if Kellogg bids, I have to be within 5 percent of what they're bidding, so they cut their margins very tight, which is why you see so many people within 5 percent of the made. And it's not just happening with Valley. You'll see large bidders like Kellogg in those documents, and a lot of people are within 5 percent of them. Well, generally in the wholesale grocery business, the margins are very small. Absolutely. Very small. Absolutely. You know, within pennies. And these guys know what they're doing. They can figure out, or at least they try, and they miss sometimes. And sometimes they get within the 5 percent, but they screw up the way they do the paperwork. But that's their business. They're very good at this. They don't need to see the bidding documents to get within 5 percent. Now, if they did, of course, that obviously is price rating. Ms. Miller, what you're saying is that the misrepresentations by Kelson in his affidavit for procuring of the warrant appear at paragraph 7A and B, that is, that original handwritten and typewritten information on the Valley Foods bids was part of the copy of the bids submitted by the question firms, and Valley Foods' facsimile telephone number were present on the bid copies. Right. Isn't that what Moore said? Yeah. So? But he says he'll testify to the pricing literations. And not only that, Moore's – he refers to Moore's physical examination evidence report and attaches it here, too, incorporates here, and so if – so that if Kelson is overstating the case or is making conclusions which are not backed up by the evidence, he's not pulling the wool over the eyes of the magistrate because he's saying, and here's a report from which I get this conclusion, which is Moore's report. You can read it yourself. And the magistrate can read that report himself. And if he comes to a different conclusion, he can say, Kelson, I think you're wrong in your conclusion and you have made out a probable cause. But he didn't do that. Well, you're pointing to one thing. And, you know, you should – I'm sure – have you read – I'm sure you have. You read Mr. Moore's report, and there's a lot of stuff in it, and that he submitted this much stuff. If you look at what he submitted, he submitted seven written reports, he submitted four charts, he submitted Moore's report, he submitted his affidavit, and his statement of probable cause. He gave this court probably an inch and a quarter stuff. And then they talked it through and he signed a warrant. You know. But that's not all that's wrong with it. The problem is it's that way on many, many things. There's nothing that he did to bolster his representation that they were all phony businesses when that clearly wasn't true as to Bayou. There's nothing that he gave him that would support the concept that all their income came from Valley Foods. He didn't give him that. He said it in his affidavit. The judge relied on it. In the affidavit it didn't say all the income came from Valley Foods. He said on page 205 of the record I've given you, since virtually all and at least 70 percent of each of the so-called small businesses' annual receipts were derived from the sale of goods from a single supplier, they're fraud. That wasn't true as regard to Bayou. And he said I assumed it was true, but if he looked at the small business file, which he said he did, he would know it wasn't true. He referred to them constantly as the so-called small business. They were a small business. My little minute? I'll save my little minute. Thank you. Please, the Court. My name is Robert Collins. I represent the defendant, Mr. Kelsen. This is a classic case. It's a white-collar crime case that arose from what Mr. Kelsen believed to be a violation of state bidding laws and that he believed that there was a sharing of bidding information which would demonstrate evidence of bid rigging or pricing information. It was a classic case of judicial deception that was going to be based on substantially circumstantial evidence unless they could find specific documents where there was clear evidence of price sharing. What is the effect of the stipulation that was arrived at between the State Attorney General and the counsel for Bayou or Beebe saying, in effect, and correct me if I've mischaracterized it, please do, that Kelsen was wrong? Kelsen in his affidavit for procurement of the warrant was incorrect as to the facts. I don't think that stipulation should be given collateral estoppel effect. And as I noted in the my footnote 5 in the brief. Why isn't that stipulation binding on Kelsen? The same people who were representing the State of California then, the Attorney General's office, are representing him now. That's true. But the issue in that sense was not an issue of qualified immunity. And there was no findings about the stipulation itself that showed any evidence of the falsity of the affidavit. I agree. There's a specific reference in the stipulation that this is not a finding on whether he was negligent, malicious, wrongful, et cetera, right? But what fact did you say Kelsen got wrong? The stipulation shows he got wrong. What fact is that? What representation? It wasn't a stipulation prepared by Kelsen. It wasn't Kelsen's stipulation. You're not answering my question, Mr. Collins. And in the testimony that occurred in the criminal matter, when Mr. Kelsen was discussing the stipulation, and I think that's a. Now, let me rephrase my question. What fact does the stipulation admit Kelsen got wrong? Fact or facts? I don't think that the stipulation is an accurate understanding. I didn't ask you whether it was accurate. Sometimes stipulations are inaccurate, but they establish facts for litigation. I'll try a third time. Please concentrate on this question. What facts or fact does the stipulation say Kelsen got wrong? I think the stipulation says that. Once you get the stipulation and I'm thinking what it says, just read the facts that he got wrong. I think the key fact that the stipulation got wrong was exactly what was being attributed to Mr. Moore and what Mr. Moore would testify about as to the sharing of pricing information. Read it to us. The entire stipulation says, the part says, it is further stipulated that the statement in Kelsen's affidavit in support of the search warrant dated January 14th, et cetera, page 3, that the question David S. Moore would testify as to his analysis and confirmation that the bidding documents submitted to the State of California were, in most cases, from common source documents which considered pricing information. Now, it's true that Mr. Moore testified. In most cases, the bids did not contain common source documents or common information about pricing. He did say that. But what he didn't say was that there was no information about pricing that was being shared. All right. So in that sense, the stipulation is wrong. The stipulation admitted that Kelsen had misrepresented, either negligently or however, but had misstated what Moore had said regarding the common source of the documents. Correct? None of the common source of the documents. And I think there is some confusion over what Kelsen understood from Moore's conversations and what the stipulation says. And I think the stipulation basically says Moore would say that the documents contain common source information which contains pricing information. And Moore said in his deposition, in some, in most cases, that was true. But he doesn't say that in all cases that was true. And so there's an inference, I think, created that at least in some cases, there was some common source document information that was being shared showing some pricing information. I would also point out that Kelsen and the others. That this big distributor would sell in bulk to the state. I don't think that it's clear whether it was that price or whether they were sharing some pricing information from other bidders. But certainly they were sharing pricing information that Kelsen understood had been Well, who prepared the affidavit and the search warrant? Mr. Kelsen prepared the affidavit. You don't have a, not an attorney with the Attorney General's office? Well, I know that Mr. Kelsen prepared the affidavit for the search warrant. I believe it may have actually been reviewed by an attorney at the office before it was Who would that have been? I believe it was Green? Mr. Green or Ms. Alden. I don't remember. I don't recall which. To what extent was Mr. Moore's investigation filed, presented to the court? Was that just through the affidavit? Or was a separate report presented? In the criminal case, Your Honor? Yes. Yes, I believe in the criminal case, the report was attached, provided to the court through Mr. Kelsen's affidavit. So it was attached or in some fashion was presented to the judge? Right. It was actually attached to his affidavit for the search warrant. Ultimately, I think that the affidavit for the search warrant demonstrates that there was enough circumstantial evidence in this case to make a determination that probable cause existed. And I, frankly, I think that even considering some of the false information or the facts that are pointed out by appellants, I still think that there was sufficient probable cause. What's left after that's taken out? Well, and I think what's left after that's taken out is you have Moore's report, which says what it says, and I don't think that there's actually any inaccuracies in Moore's report about his evaluation of the evidence. There is also communications between Moore and Mr. Kelsen about pricing information, and that was in the record that, in fact, they did talk about pricing information. There is also ---- Well, the question is not whether Moore talked to Kelsen about pricing information. The question is whether Valley talked to Bayou about pricing information. Where are the facts in the affidavit that show that? Well, and I think that that's ----  I think that the inference that was created from Moore's report and based on those discussions that Moore and Kelsen had, that there appeared at that point to be a suspicion of price sharing or of pricing information. So the information which provides a probable cause for the issuance of the subpoena or the search warrant is what Moore told Kelsen in his report, which Kelsen attached to Kelsen's affidavit. And also the information in the affidavit where Moore does say he talked to Kelsen about pricing information. So I think that there was an inference, and as I believe Your Honor pointed out, that if there really was an intent to deceive what the report said and what Mr. Kelsen's understanding was, the report would not have been attached to the affidavit. I think there was ---- Well, would you say the work that was done on this affidavit for the search warrant was sloppy? Absolutely. It was not ---- it was not a well-crafted warrant. It was a ---- I think it was a sloppy attempt at the search warrant. But clearly ---- Okay. So how is your office going to ever learn then? Well, part of the problem in this case was I think this was a criminal case realistically being pursued by our antitrust division, perhaps not the best of the criminal lawyers in the office. So the only thing I could say is if they're going to take an antitrust criminal case, it should be handled by antitrust people and the criminal people working in concert to get it right, because in this application, I think the ---- it's clear and we admit that the application for the search warrant was very sloppy. Well, bid rigging is a much harder crime to prove than something like a narcotics violation and all that. And most investigators aren't used to working with this sort of thing, right? That's correct, Your Honor. And I think that that's part of the situation in this case is that they were at the And it was going to be based on circumstantial information as to whether or not there was price-sharing going on. But at the stage of the search warrant, they didn't have to find that kind of proof beyond a reasonable doubt to get a conviction. What they had to have was reasonable suspicions that there was some price-sharing information going on. And ---- And you say that Moore did say that to Kelson. Moore did. As I recall from the record, Moore did talk about price-sharing information to Kelson. Now, he didn't necessarily put that information in his report. As a matter of fact, I don't think he put the pricing information at all in his report.  I'm sorry? Actually, I don't think the pages that talk about it are ---- Strike that. In Mr. Moore's deposition, which is in our record, page 162, it's page 83 of Mr. Moore's He says, the question was, do you anywhere indicate pricing information where you found that had been communicated? And he says, I don't think it's in the report itself. I did not. Where did you communicate that? I certainly would have communicated, I certainly would have pointed it out to Mr. Kelson. In fact, if I am not mistaken, in some cases he pointed it out to me. So there was discussion between Mr. Moore and Mr. Kelson about pricing information. In the subjunctive, I certainly would have pointed it out. I did point it out in the indicative. Well, isn't that the way that the bureaucrat talks when he doesn't want to have the exact facts? That's the way that Mr. Moore talked and ---- but Mr. Kelson clearly understood, clearly said that he and Moore talked about pricing information. But that never got into the affidavit. I'm sorry? That didn't get into the affidavit? Yeah, I believe that. I believe that that was in the affidavit. Well, where in the affidavit does it say Moore told me that there was pricing information in the documents from Bayview, which Valley had given pricing information? I don't think it is that clear in the affidavit, but he does ---- Tell me where it's that unclear in the affidavit. In Mr. Kelson's report, number one, on page three of his report, he does say, Examiner, California Department of Justice, will testify as to his analysis and confirmation that the bidding documents submitted to the State were, in most cases, contained common source documents which contained pricing information. What page is that on there? It's page three. It's in my excerpt of the record, page 42 of it, and page three of report number one, which is attached to Kelson's affidavit. The other thing is that ---- You see, when you go in to see a judge and you're asking for a search warrant, and you get an affidavit, and he's relying on the expertise of your office, right? Correct. He's relying on your credibility, right? Correct. So if you do a sloppy job, you're failing in your duty. Isn't that right? Well, we certainly did a sloppy job, and I'm sure we failed in our duty. Well, sure you failed in your duty because you didn't have it in there correctly, and you went in there and asked him for a search warrant. And the way that usually works is that the investigator comes in with the client or whatever, and they bring it in to the judge in the sense they almost spring it on them. You know, here it is. We'll wait for it. You look at it. Then he asks a few questions because he trusts you. And then he signs it. But it's sloppy. It's kind of screwed up, you know. It's not fair to the judges. I would have to agree, Your Honor, that it was a sloppy job. And your office is derelict in its duty. I think Your Honor is correct in that this was a sloppy job done on this affidavit for this search warrant. I don't disagree at all. So what do we do about that? You say, good boy, go home, forget about it? Even though I think it was a sloppy job, I still think there is sufficient information in the affidavit for the search warrant. As part of Mr. Kelson's report, he also talks about in paragraph 6 in the affidavit. This was a criminal case, right? Correct. How did it all end up just for the record here? I'm sorry. How did it end up for the record here? After the criminal case concluded, then the BBs brought a Section 1983 action essentially for a violation of their civil rights in the search warrant. I think the answer to Judge Ferguson's question was the criminal case ended up with the State dismissing the action. Correct. Yes. I just want the people in the audience to know what's going on in this State, you know. When you dismissed it, did you get a probable cause stipulation? When it was dismissed. When it was dismissed. We'll dismiss it if you stipulate that there was probable cause. No, I think the… Did you get that? No, the reason… Well, they usually get that, don't they? The reason in this case, as I understand it, it was dismissed, eventually dismissed, was First Judge Parks threw out all of the evidence seized in the search because there was an overbroad execution of the search warrant. I don't think there was ever an interpretation of the actual warrant itself to determine whether or not there was probable cause, other than what was done by the original Supreme Court or Superior Court judge who issued the search warrant. That was never determined. It was just an overbreadth of the search. That was my understanding of the original Judge Parks' ruling in May of 97, I believe, that the… They grabbed up some personal items. They grabbed up a whole bunch of stuff, and as a result of that, he thought the entire search was overbroad and threw out all of the evidence from the search. That's pretty unusual for a judge to do that. It is. I've never heard of a judge saying, well, you went in there and you took much more than you should have. Usually they go in with wheelbarrows and U-Haul trucks and take everything out. Nobody complains. And I have no understanding or explanation as to why Judge Parks made the ruling that he did at the time of the essentially ruling that the search was so broad as to be a bad search and threw out all of the evidence. And once he threw out all of the evidence, essentially there was no criminal case. I would also point out that the other suspicious thing that at least gave some indication… But it had a 1983 matter potential. A broad search warrant. Ran in and just grabbed everything. That was also part of the case that occurred in the district court. And although Judge Parks threw out all of the evidence in the criminal case, in the civil case, the portion of the overbroad execution of the search warrant… That's not on appeal here, is it? …is not on appeal here, but it still does remain in the case below in the sense that whether or not qualified immunity would apply to those officers who did the overbroad search or overbroad execution of the search. That part of the case actually does remain below and is not on appeal. Okay. The other points that I would point that I would… You've overrun your time, counsel. Thank you very much. May I point out… Sorry. Give the State a little time. In the affidavit at the excerpt of Record 206, paragraph 6 of the affidavit talks about various telephone calls that occurred between the Valley Shoes and the State Procurement Office in Bayou. And that information is further set forth and further described in Report No. 1 of Kelson's… You cover all that in your brief, right? Right. And it's covered in the brief. And that, to me, shows that there was a lot of communication that seemed suspicious that was going on, and that's why they were looking for the evidence, clear evidence that would uphold the conviction. Who was running the Attorney General's office when this was going on? Well, I'm not sure, Your Honor. I haven't been with the Attorney General's office at that time, and I don't recall. It may have been Agent Wilson. I'm not sure. I mean, but who was the Attorney General? That's what I'm talking about. It may have been either Dick Majan or, I'm not Pete Wilson, Dick Majan or… No, that's all right. Mr. Collins, Paragraph 6, An agent for Valley Foods has called the State Office of Procurement several times and inquired whether or not Bayou Seafood was awarded a particular contract. If Valley Foods was selling to Bayou Foods, wouldn't they be legitimately interested whether Bayou Foods had gotten a contract? It could be construed as legitimate information, but even in the context of legitimate information, innocent information, the way I read the Illinois v. Gates case basically was almost all innocent information can still be used as a basis for probable cause. Okay. Thank you. Thank you for answering my questions. Do you want to say something? Well, since you remind me of my English teacher, I better let you say it. That's not what I meant. Most people talk about how I remind them of a lawyer. It's a way to talk to us. Am I lecturing you? No, I'm serious. I want to say one thing about the stipulation. Here's my English professor sitting right here. Actually, so I've heard. On page 220 of the record, the stipulation with regard to David Moore, Mr. Collins read me the second paragraph. The first paragraph is very important. In regard to the above entitled matter, it is hereby stipulated in examination of all the bid forms, no question document expert, including David S. Moore, has heretofore formed an opinion as to when in time any of the obliterations on the bid forms were performed or by whom, and no such question documents expert has stated in any report or testified before the grand jury that any prices obliterated were obliterated as between Valley Foods and Bayou Seafoods. That's important. And Mr. Moore did testify before the grand jury. And, you know, what happened here is they go to the preliminary hearing. The judge tells Ms. Alden, the prosecuting attorney for the AG's office, if this is your expert, you're in trouble. You're not going to make it here. This man did not come here with straight information. He picked and chose and stated things purely to get to this point, and she dismissed the case at that point. Then she turned around and got a grand jury indictment using the same evidence in front of a grand jury. She came back from that, and ultimately that case was dismissed by Judge Park. His order is in your excerpt, and in his order he makes clear the salient points in the end of their case have nothing to do with illegality. All of this stuff is perfectly innocent. That was my one point. My second point is certainly if Mr. Moore and Mr. Kelson had conversations, the warrant judge didn't know about them. He didn't know about them. And second of all, even in the depositions, they never tied anything to Bayou. They had nothing on Bayou. To the degree that this looks just sloppy. They had nothing on who? On Bayou. They may have had on Bayou Seafoods, on this party. This party they had nothing. To suggest that this is pure negligence or just sloppy is problematic. This went on for five years, Your Honors. We're 14 years from that date. They kept it up and they kept it up. The overbroad search, to me, this is nothing. Mr. Kelson supervised that search. He was in charge of that. This man wanted this stuff so bad he was willing to do and say anything. And by golly, that's not sloppy. That is not sloppy. That is intentional. That is I'm going to make my name. I'll leave that for the jury. I want a jury. Thank you. And the last thing I'll point out to you is all your cases say if reasonable people could differ on this, that the client is entitled to a jury. If you just look at the difference between Nowinski and magistrate Judge Nowinski's order, Nowinski had no doubt these facts were totally wrong. Kelson knew better. But he says, well, he didn't understand the law. This AG's office is still saying he's the best they had. They went and got him to do this. This was a specially trained investigator. And that's the end of my argument. And I thank you for your attention. Okay. Okay. The matter will stand submitted.
judges: Pregerson, Siler , Bea